**IN THE UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF CALIFORNIA**

|  |  |
|---|---|
| ADAM CORNEJO, | No.  2:18-CV-0571-KM-DMC-P |
| Petitioner, |  |
| v. | <u>FINDINGS AND RECOMMENDATIONS</u> |
| JOE LIZZARAGA, |  |
| Respondent. |  |

   Petitioner, a state prisoner proceeding with retained counsel, brings this petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Pending before the Court are Petitioner's petition for a writ of habeas corpus, ECF No. 1, and Respondent's answer, ECF No. 19.  Petitioner did not file a traverse.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

1

# I. BACKGROUND

**A.**     **Facts**[1]

The state court recited the following facts, and petitioner has not offered any clear and convincing evidence to rebut the presumption that these facts are correct:

> Deandre Ellison was shot to death as he drove into his driveway in the Del Paso Heights neighborhood of Sacramento. Four other men, including Latrele Neal, were also in Ellison's car. Before the car came to a stop in the driveway, an SUV driven by Jesse Cornejo slowly drove past Ellison's house; the SUV's front and backseat passengers, Adam Cornejo and Isaac Vasquez, opened fire on Ellison's car. (foot note omitted) Neal managed to return fire with Ellison's gun before the SUV drove away. About 20 bullets were exchanged between the vehicles. Bullets also struck Ellison's house. Ellison was the only casualty. After crashing the SUV while being pursued by law enforcement, Adam, Jesse, and Isaac were taken into custody a short time later. Each was a Norteño gang member. Isaac was 16 years old with a developmental disability; Adam and Jesse were 17 and 18 years old, respectively.
>
> * * *
>
> On the afternoon of January 19, 2011, Ellison left his home to go to the store. He drove his wife's Ford Taurus and brought along three other men, including Neal, who sat in the back of the car directly behind Ellison. On the way to the store, Ellison picked up another man, who was walking to Ellison's house, and then continued on to the store. Ellison, a former gang member, had a .40-caliber handgun in the car's center console. According to his wife, he bought the gun for protection. Having recently testified against another gang member in exchange for being released from jail, Ellison had received threats and was concerned about retaliation for being a "snitch." Neal was aware of the threats. He was also aware Ellison had a gun in the center console.
>
> When Ellison and his companions returned from the store, they turned onto Ellison's street and noticed two vehicles approaching from the opposite direction. The first vehicle was a small car. The second vehicle was a Ford Explorer containing the defendants in this case. In order to pull into his driveway, which was on the left side of the street, Ellison turned between the two vehicles. Around this time, Neal noticed the occupants of the Explorer were giving them "hard looks" and said: "[W]ho is them muggin' us?" Before Ellison was able to put the car in park, Neal opened his door and started to step out to "figure out who was in them cars." As he did so, the Explorer stopped in front of Ellison's house and the front and backseat passengers, Adam and Isaac, opened fire with semi-

---

[1]     Pursuant to 28 U.S.C. § 2254(e)(1), ". . . a determination of a factual issue made by a State court shall be presumed to be correct."  Findings of fact in the last reasoned state court decision are entitled to a presumption of correctness, rebuttable only by clear and convincing evidence.  See Runningeagle v. Ryan, 686 F.3d 759 n.1 (9th Cir. 2012).  Petitioner bears the burden of rebutting this presumption by clear and convincing evidence.  See id.  These facts are, therefore, drawn from the state court's opinion(s), lodged in this court.  Petitioner may also be referred to as "defendant."

automatic handguns.

Neal managed to "jump back in the car" before the first shots were fired. Multiple bullets struck the Taurus, shattering the rear window. When someone in the car said, "shoot back," Neal grabbed Ellison's handgun from the center console, fired one round through the "busted out" back window, and then got out of the car and continued firing at the Explorer until he "couldn't shoot no more." Neal fired at least six rounds. However, it does not appear any of Neal's shots struck the Explorer. Shots fired by Adam and Isaac were far more accurate. Combined, they fired at least 14 rounds, hitting both the Taurus and Ellison's home multiple times. One bullet struck Ellison in the upper back as he leaned forward in the driver's seat, traveled through his neck and head, and lodged in his brain. Death from this gunshot wound came within a matter of minutes.

After Adam and Isaac finished firing upon Ellison and his companions, the Explorer drove away. The Taurus's remaining passengers got out of the car. Neal "took off running" with Ellison's gun because he was afraid of being arrested for being a felon in possession of a firearm. Ellison's wife, Jettiemarie Boyd, who witnessed the shooting from outside her neighbor's home, ran to her husband. During the shooting, the Taurus had continued forward into the garage door. The tires were still spinning when Boyd reached the car. She put the car in park, removed the keys from the ignition, and tended to her husband. Boyd's mother and various neighbors also came out to check on Ellison, who was "slumped over the steering wheel" with "blood . . . coming out of his neck, running down his chest." He died before law enforcement and medical personnel arrived on the scene.

A description of the Explorer and the shooters was given to police at the scene and relayed over the radio to nearby patrol cars. The vehicle was located a short time later, not far from the crime scene. When a traffic stop was initiated, Jesse led officers on a high-speed chase, reaching speeds of 85 miles per hour, before crashing the Explorer in an intersection. Defendants then attempted to flee on foot; each was taken into custody. During the chase, two handguns were thrown from the Explorer. Police recovered a 10-millimeter handgun along the chase route. Eight 10-millimeter casings found at the scene appeared to have been fired by this gun. A magazine for a 9-millimeter handgun and several unfired 9-millimeter rounds were also recovered along the chase route. The gun associated with the magazine and bullets was not recovered. However, Isaac admitted to police that a 9-millimeter handgun was also thrown from the vehicle and two 9-millimeter casings found in the Explorer appeared to have been fired by the same gun that fired six such casings found at the scene of the crime. Gunshot residue tests also corroborated the fact that Adam and Isaac were the shooters, while Jesse drove the Explorer.

Finally, the prosecution provided testimony from an expert on criminal street gangs, Detective John Sample, who testified Jesse, Adam, and Isaac were each active members of the Norteño street gang, and a hypothetical shooting based on the facts of this case would have been committed in association with or for the benefit of the gang. We provide a more detailed description of Detective Sample's testimony in the discussion that follows.

ECF No. 14-1, pgs. 2, 6-8.

///

3

1

**B.**      **Procedural History**

2

1.      State Court

3

The state court recited the following procedural history leading to Petitioner's

4

conviction and sentence:

5

> Adam, Jesse, and Isaac were tried together and convicted by jury
> of one count of second-degree murder (Pen. Code, § 187, Count One),

6

> (footnote omitted). four counts of attempted murder (§§ 664/187, Counts
> Two, Three, Four, and Five), and one count of shooting at an inhabited

7

> dwelling (§ 246, Count Six). Jesse was also convicted of one count of
> driving in willful or wanton disregard for safety while fleeing from a

8

> pursuing peace officer. (Veh. Code, § 2800.2, subd. (a), Count Seven.)
> With respect to the murder, the jury found the offense was committed by

9

> means of shooting a firearm from a motor vehicle at another person
> outside the vehicle with the intent to inflict great bodily injury. (§ 190,

10

> subd. (d).) The jury also found the crimes were committed for the benefit
> of, at the direction of, or in association with a criminal street gang with the

11

> specific intent to promote, further, or assist in any criminal conduct by
> gang members. (§ 186.22, subd. (b).) Various firearm enhancement

12

> allegations were also found to be true. (§§ 12022.53, subds. (c), (d), (e)(1),
> 12022.5, subd. (a).) The trial court sentenced Adam and Isaac to serve an

13

> aggregate indeterminate prison term of 120 years to life plus a consecutive
> determinate term of 9 years 4 months. Jesse was sentenced to serve the

14

> same indeterminate term of 120 years to life plus a consecutive
> determinate term of 10 years.

15

ECF No. 14-1, pg. 3.

16

17

Petitioner was convicted On September 14, 2012.  See ECF No. 14-5, pg. 2;

18

(Petitioner's state habeas petition to the California Court of Appeal, filed September 11, 2014);

19

see also ECF No. 1, pg. 9.  On September 6, 2016, the California Court of Appeal affirmed the

20

conviction but modified the sentence to strike the gang enhancement pursuant to People v.

21

Prunty, 62 Cal. 4th 59 (2015), a case which had been decided while the appeal was pending.  See

22

ECF No. 14-1; see also ECF No. 1, pg. 9.  On October 3, 2016, the appellate court modified its

23

September 6, 2016, decision at page four, footnote 3.  See ECF No. 14-2, pg. 73.  The

24

modification did not affect the judgment.  See id. at pg. 74.  The California Supreme Court denied

25

direct review without comment or citation on December 14, 2016.  See ECF No. 14-3.  Petitioner

26

did not seek certiorari in the United States Supreme Court.  On January 26, 2017, Petitioner was

27

resentenced to an indeterminate term of 20 years to life plus a consecutive term of 9 years 4

28

months.  See ECF No. 14-4, pgs. 1-5 (Abstract of Judgement on resentencing).

1    With his direct appeal, Petitioner filed a pro se petition for a writ of habeas corpus

2    in the California Court of Appeal, which was denied without prejudice to re-filing in the trial

3    court.  See ECF No. 1, pg. 10.  Petitioner did so, filing a habeas petition in the Sacramento

4    County Superior Court on November 11, 2014.  See id.  The Superior Court denied the petition

5    on November 24, 2014, because Petitioner had not presented any evidence to support his claim of

6    ineffective assistance of counsel.  See id.; see also ECF No. 14-8, pgs. 1-3.

7    Following conclusion of proceedings on direct review, Petitioner filed a petition

8    for a writ of habeas corpus in the Sacramento County Superior Court on October 26, 2017.  See

9    ECF No. 14-9; see also ECF No. 1, pg. 10.  The Superior Court denied the petition in a reasoned

10   decision issued on February 5, 2018.  See ECF No. 14-10; see also ECF No. 1, pg. 10.

11   2.    Federal Court

12   The instant federal petition, filed on March 15, 2018, sets forth six claims for

13   relief.  See ECF No. 1.  On September 27, 2018, Respondent filed a motion to dismiss arguing

14   claims 2, 3, and 5 were not exhausted in state court.  See ECF No. 13.  On October 29, 2018,

15   Petitioner filed a response to Respondent's motion in which he agreed to withdraw claims 2, 3,

16   and 5.  See ECF No. 15.  Respondent filed his answer to Petitioner's federal petition on February

17   7, 2019.  See ECF No. 19.  Petitioner did not file a traverse.

18

19   **II.  STANDARDS OF REVIEW**

20   Because this action was filed after April 26, 1996, the provisions of the

21   Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") are presumptively applicable.

22   See Lindh v. Murphy, 521 U.S. 320, 336 (1997); Calderon v. United States Dist. Ct. (Beeler), 128

23   F.3d 1283, 1287 (9th Cir. 1997), cert. denied, 522 U.S. 1099 (1998).  The AEDPA does not,

24   however, apply in all circumstances.  When it is clear that a state court has not reached the merits

25   of a petitioner's claim, because it was not raised in state court or because the court denied it on

26   procedural grounds, the AEDPA deference scheme does not apply and a federal habeas court must

27   review the claim de novo.  See Pirtle v. Morgan, 313 F.3d 1160 (9th Cir. 2002) (holding that the

28   AEDPA did not apply where Washington Supreme Court refused to reach petitioner's claim

5

1  under its "re-litigation rule"); see also Killian v. Poole, 282 F.3d 1204, 1208 (9th Cir. 2002)

2  (holding that, where state court denied petitioner an evidentiary hearing on perjury claim, AEDPA

3  did not apply because evidence of the perjury was adduced only at the evidentiary hearing in

4  federal court); Appel v. Horn, 250 F.3d 203, 210 (3d Cir.2001) (reviewing petition de novo where

5  state court had issued a ruling on the merits of a related claim, but not the claim alleged by

6  petitioner).  When the state court does not reach the merits of a claim, "concerns about comity and

7  federalism . . . do not exist."  Pirtle, 313 F. 3d at 1167.

8         Where AEDPA is applicable, federal habeas relief under 28 U.S.C. § 2254(d) is

9  not available for any claim decided on the merits in state court proceedings unless the state court's

10  adjudication of the claim:

11         (1) resulted in a decision that was contrary to, or involved an unreasonable
           application of, clearly established Federal law, as determined by the
12         Supreme Court of the United States; or

13         (2) resulted in a decision that was based on an unreasonable determination
           of the facts in light of the evidence presented in the State court proceeding.
14

15  Under § 2254(d)(1), federal habeas relief is available only where the state court's decision is

16  "contrary to" or represents an "unreasonable application of" clearly established law.  Under both

17  standards, "clearly established law" means those holdings of the United States Supreme Court as

18  of the time of the relevant state court decision.  See Carey v. Musladin, 549 U.S. 70, 74 (2006)

19  (citing Williams, 529 U.S. at 412).  "What matters are the holdings of the Supreme Court, not the

20  holdings of lower federal courts."  Plumlee v. Masto, 512 F.3d 1204 (9th Cir. 2008) (en banc).

21  Supreme Court precedent is not clearly established law, and therefore federal habeas relief is

22  unavailable, unless it "squarely addresses" an issue.  See Moses v. Payne, 555 F.3d 742, 753-54

23  (9th Cir. 2009) (citing Wright v. Van Patten, 552 U.S. 120, 28 S. Ct. 743, 746 (2008)). For federal

24  law to be clearly established, the Supreme Court must provide a "categorical answer" to the

25  question before the state court.  See id.; see also Carey, 549 U.S. at 76-77 (holding that a state

26  court's decision that a defendant was not prejudiced by spectators' conduct at trial was not

27  contrary to, or an unreasonable application of, the Supreme Court's test for determining prejudice

28  created by state conduct at trial because the Court had never applied the test to spectators'

6

1    conduct).  Circuit court precedent may not be used to fill open questions in the Supreme Court's

2    holdings.  See Carey, 549 U.S. at 74.

3              In Williams v. Taylor, 529 U.S. 362 (2000) (O'Connor, J., concurring, garnering a

4    majority of the Court), the United States Supreme Court explained these different standards.  A

5    state court decision is "contrary to" Supreme Court precedent if it is opposite to that reached by

6    the Supreme Court on the same question of law, or if the state court decides the case differently

7    than the Supreme Court has on a set of materially indistinguishable facts.  See id. at 405.  A state

8    court decision is also "contrary to" established law if it applies a rule which contradicts the

9    governing law set forth in Supreme Court cases.  See id.  In sum, the petitioner must demonstrate

10   that Supreme Court precedent requires a contrary outcome because the state court applied the

11   wrong legal rules.  Thus, a state court decision applying the correct legal rule from Supreme Court

12   cases to the facts of a particular case is not reviewed under the "contrary to" standard.  See id. at

13   406.  If a state court decision is "contrary to" clearly established law, it is reviewed to determine

14   first whether it resulted in constitutional error.  See Benn v. Lambert, 283 F.3d 1040, 1052 n.6

15   (9th Cir. 2002).  If so, the next question is whether such error was structural, in which case federal

16   habeas relief is warranted.  See id.  If the error was not structural, the final question is whether the

17   error had a substantial and injurious effect on the verdict, or was harmless.  See id.

18             State court decisions are reviewed under the far more deferential "unreasonable

19   application of" standard where it identifies the correct legal rule from Supreme Court cases, but

20   unreasonably applies the rule to the facts of a particular case.  See Wiggins v. Smith, 539 U.S.

21   510, 520 (2003).  While declining to rule on the issue, the Supreme Court in Williams, suggested

22   that federal habeas relief may be available under this standard where the state court either

23   unreasonably extends a legal principle to a new context where it should not apply, or

24   unreasonably refuses to extend that principle to a new context where it should apply.  See

25   Williams, 529 U.S. at 408-09.  The Supreme Court has, however, made it clear that a state court

26   decision is not an "unreasonable application of" controlling law simply because it is an erroneous

27   or incorrect application of federal law.  See id. at 410; see also Lockyer v. Andrade, 538 U.S. 63,

28   75-76 (2003).  An "unreasonable application of" controlling law cannot necessarily be found even

1   where the federal habeas court concludes that the state court decision is clearly erroneous.  See

2   Lockyer, 538 U.S. at 75-76.  This is because "[t]he gloss of clear error fails to give proper

3   deference to state courts by conflating error (even clear error) with unreasonableness."  Id. at 75.

4   As with state court decisions which are "contrary to" established federal law, where a state court

5   decision is an "unreasonable application of" controlling law, federal habeas relief is nonetheless

6   unavailable if the error was non-structural and harmless.  See Benn, 283 F.3d at 1052 n.6.

7          The "unreasonable application of" standard also applies where the state court

8   denies a claim without providing any reasoning whatsoever.  See Himes v. Thompson, 336 F.3d

9   848, 853 (9th Cir. 2003); Delgado v. Lewis, 233 F.3d 976, 982 (9th Cir. 2000).  Such decisions

10  are considered adjudications on the merits and are, therefore, entitled to deference under the

11  AEDPA.  See Green v. Lambert, 288 F.3d 1081 1089 (9th Cir. 2002); Delgado, 233 F.3d at 982.

12  The federal habeas court assumes that state court applied the correct law and analyzes whether the

13  state court's summary denial was based on an objectively unreasonable application of that law.

14  See Himes, 336 F.3d at 853; Delgado, 233 F.3d at 982.

15

16                          **III.  DISCUSSION**

17          This case proceeds on three claims: (1) the trial court did not properly instruct the

18  jury on causation (claim 1); (2) the trial court violated Petitioner's right to confront witnesses by

19  admitting hearsay from a gang expert (claim 4); and (3) the sentence imposed constitutes cruel

20  and unusual punishment (claim 6).

21          A.      **Causation Jury Instruction**

22          In claim 1, Petitioner asserts the trial court erred in instructing the jury on

23  causation pursuant to CALJIC No. 3.41 instead of CALCRIM No. 520.  See ECF No. 1, pgs.

24  20-21.

25          A writ of habeas corpus is available under 28 U.S.C. § 2254 only on the basis of a

26  transgression of federal law binding on the state courts.  See Middleton v. Cupp, 768 F.2d 1083,

27  1085 (9th Cir. 1985); Gutierrez v. Griggs, 695 F.2d 1195, 1197 (9th Cir. 1983).  It is not available

28  for alleged error in the interpretation or application of state law.  See Middleton, 768 F.2d at

1085; see also Lincoln v. Sunn, 807 F.2d 805, 814 (9th Cir. 1987); Givens v. Housewright, 786

F.2d 1378, 1381 (9th Cir. 1986).  Habeas corpus cannot be utilized to try state issues de novo.

See Milton v. Wainwright, 407 U.S. 371, 377 (1972).  Thus, a challenge to jury instructions does

not generally give rise to a federal constitutional claim.  See Middleton, 768 F.2d at 1085) (citing

Engle v. Isaac, 456 U.S. 107, 119 (1982)).

However, a "claim of error based upon a right not specifically guaranteed by the

Constitution may nonetheless form a ground for federal habeas corpus relief where its impact so

infects the entire trial that the resulting conviction violates the defendant's right to due process."

Hines v. Enomoto, 658 F.2d 667, 673 (9th Cir. 1981) (citing Quigg v. Crist, 616 F.2d 1107 (9th

Cir. 1980)); see also Lisenba v. California, 314 U.S. 219, 236 (1941).  In order to raise such a

claim in a federal habeas corpus petition, the "error alleged must have resulted in a complete

miscarriage of justice."  Hill v. United States, 368 U.S. 424, 428 (1962); Crisafi v. Oliver, 396

F.2d 293, 294-95 (9th Cir. 1968); Chavez v. Dickson, 280 F.2d 727, 736 (9th Cir. 1960).

In general, to warrant federal habeas relief, a challenged jury instruction "cannot

be merely 'undesirable, erroneous, or even "universally condemned,"' but must violate some due

process right guaranteed by the fourteenth amendment."  Prantil v. California, 843 F.2d 314, 317

(9th Cir. 1988) (quoting Cupp v. Naughten, 414 U.S. 141, 146 (1973)).  To prevail, petitioner

must demonstrate that an erroneous instruction "'so infected the entire trial that the resulting

conviction violates due process.'"  Estelle v. McGuire, 502 U.S. 62, 72 (1991) (quoting Cupp,

414 U.S. at 147).  In making its determination, this Court must evaluate an allegedly ambiguous

jury instruction "'in the context of the overall charge to the jury as a component of the entire trial

process.'"  Prantil, 843 F.2d at 817 (quoting Bashor v. Risley, 730 F.2d 1228, 1239 (9th Cir.

1984)).  Further, in reviewing an allegedly ambiguous instruction, the Court "must inquire

'whether there is a reasonable likelihood that the jury has applied the challenged instruction in a

way' that violates the Constitution."  Estelle, 502 U.S. at 72 (quoting Boyde v. California, 494

U.S. 370, 380 (1990)).  Petitioner's burden is "especially heavy" when the court fails to give an

instruction.  Henderson v. Kibbe, 431 U.S. 145, 155 (1977).  Where an instruction is missing a

necessary element completely, the "reasonable likelihood" standard does not apply and the court

may not ". . . assume that the jurors inferred the missing element from their general experience or from other instructions. . . ."  See Wade v. Calderon, 29 F.3d 1312, 1321 (9th Cir. 1994).  In the case of an instruction which omits a necessary element, constitutional error has occurred.  See id.

It is well-established that the burden is on the prosecution to prove each and every element of the crime charged beyond a reasonable doubt.  See In re Winship, 397 U.S. 358, 364 (1970).  Therefore, due process is violated by jury instructions which use mandatory presumptions to relieve the prosecution's burden of proof on any element of the crime charged.  See Francis v. Franklin, 471 U.S. 307, 314 (1985); see also Sandstrom v. Montana, 442 U.S. 510 (1979).  A mandatory presumption is one that instructs the jury that it must infer the presumed fact if certain predicate facts are proved.  See Francis, 471 U.S. at 314.  On the other hand, a permissive presumption allows, but does not require, the trier of fact to infer an elemental fact from proof of a basic fact.  See County Court of Ulster County v. Allen, 442 U.S. 140, 157 (1979).  The ultimate test of the constitutionality of any presumption remains constant – the instruction must not undermine the factfinder's responsibility at trial, based on evidence adduced by the government, to find the ultimate facts beyond a reasonable doubt.  See id. at 156 (citing In re Winship, 397 U.S. at 364).

Even if there is constitutional error, non-structural errors may be harmless.  See Hedgpeth v. Pulido, 129 S.Ct. 530, 532 (2008) (per curiam) (citing Chapman v. California, 386 U.S. 18 (1967)).  In the context of jury instructions, an error is not structural so long as the error does not "vitiat[e] all the jury's findings."  Sullivan v. Louisiana, 508 U.S. 275, 2781 (1993) (holding that an erroneous reasonable doubt instruction resulted in structural error not subject to harmless error analysis).  An instructional error which resulted in omission of an element of the offense was a trial error subject to harmless error review.  See Hedgpeth, 129 S.Ct. at 532 (citing Neder v. United States, 527 U.S. 1 (1999)).  An erroneous aider and abettor instruction is also not structural.  See id. (citing California v. Roy, 519 U.S. 2 (1996) (per curiam)).  A jury instruction which misstates an element of an offense is also not structural.  See id. (citing Pope v. Illinois, 481 U.S. 497 (1987)).  An erroneous burden-shifting instruction is also not structural.  See id. (citing Rose v. Clark, 478 U.S. 570 (1986)).  Finally, an instruction on multiple theories of guilt

10

1  where one of the theories is improper does not result in a structural error requiring automatic

2  reversal but is error subject to harmless error analysis.  See id.

3         In Chapman, a case before the Supreme Court on direct review, the Court held that

4  "before a [non-structural] constitutional error can be held harmless, the court must be able to

5  declare a belief that it was harmless beyond a reasonable doubt."  386 U.S. at 24.  A different

6  harmless error standard applies to cases on collateral review.  In Brecht v. Abrahamson, the Court

7  stated that applying the Chapman standard on collateral review "undermines the States' interest in

8  finality and infringes upon their sovereignty over criminal matters."  507 U.S. 619, 637 (1993).

9  The Court also noted that the Chapman standard is at odds with the historic meaning of habeas

10  corpus – which is meant to afford relief only to those who have been grievously wronged –

11  because it would require relief where there is only a reasonable possibility that a constitutional

12  error contributed to the verdict.  See id.  Therefore, in habeas cases, the standard applied in

13  Kotteakos v. United States, 328 U.S. 750 (1946), governs harmless error analysis for non-

14  structural constitutional errors.  See Brecht, 507 U.S. at 637.  Under this standard, relief is

15  available where non-structural error occurs only where such error "had a substantial and injurious

16  effect or influence in determining the jury's verdict."  Kotteakos, 328 U.S. at 776.

17         1.    The State Court's Determination

18         In rejecting this claim, the California Court of Appeal stated:

19         Defendants also contend the trial court prejudicially erred and
          violated their constitutional rights by providing the jury with a different
20        instruction on causation than that contained in bracketed portions of
          CALCRIM No. 520. We disagree.
21         CALCRIM No. 520 defines the crime of murder for the jury. The
          jury was so Instructed. (footnote 6 omitted). Defendants complain the trial
22        court did not provide the following bracketed portions of the instruction
          on the issue of causation: "An act causes death if the death is the direct,
23        natural, and probable consequence of the act and the death would not have
          happened without the act. A natural and probable consequence is one that
24        a reasonable person would know is likely to happen if nothing unusual
          intervenes. In deciding whether a consequence is natural and probable,
25        consider all of the circumstances established by the evidence. [¶] There
          may be more than one cause of death. An act causes death only if it is a
26        substantial factor in causing the death. A substantial factor is more than a
          trivial or remote factor. However, it does not need to be the only factor
27        that causes the death." (CALCRIM No. 520.)

28  / / /

11

Instead of the foregoing bracketed portions of CALCRIM No. 520, the trial court instructed the jury, in language virtually identical to CALJIC No. 3.41, as follows: "There may be more than one proximate cause of a homicide, even when there is only one known or actual or direct cause of death. [¶] When the conduct of two or more persons contributes concurrently as a proximate cause of the death, the conduct of each is a proximate cause of the death if that conduct was also the substantial factor contributing to the result. [¶] A cause is concurrent if it was operative at the time of death and acted with another cause to produce death."

Both CALCRIM No. 520 and CALJIC No. 3.41 indicate in their respective use notes that a trial court has a sua sponte duty to instruct on proximate cause if causation is an issue in the case. (Use Notes to CALCRIM No. 520 and CALJIC No. 3.41.) CALCRIM No. 520's use note continues: "If the evidence indicates that there was only one cause of death, the court should give the 'direct, natural, and probable' language in the first bracketed paragraph on causation. If there is evidence of multiple causes of death, the court should also give the 'substantial factor' instruction and definition in the second bracketed causation paragraph." (Use Note to CALCRIM No. 520.)

"The California Judicial Council withdrew its endorsement of the long-used CALJIC instructions and adopted the new CALCRIM instructions, effective January 1, 2006." (*People v. Thomas* (2007) 150 Cal.App.4th 461, 465.) California Rules of Court, (footnote 7 omitted) rule 2.1050(e) provides: "Use of the Judicial Council instructions is strongly encouraged. If the latest edition of the jury instructions approved by the Judicial Council contains an instruction applicable to a case and the trial judge determines that the jury should be instructed on the subject, it is recommended that the judge use the Judicial Council instruction unless he or she finds that a different instruction would more accurately state the law and be understood by jurors." However, as our Supreme Court has explained, "a trial court's failure to give the *standard* . . . instruction does not necessarily constitute state law error," and while "use of the standard instruction . . . is preferred, it is not mandatory." (*People v. Aranda* (2012) 55 Cal.4th 342, 354.) Nor does the trial court's failure to use the standard instruction "amount to state law error when its substance is covered in other instructions given by the court." (*Ibid*.)

Here, the substance of the second bracketed causation paragraph of CALCRIM No. 520 was covered by the CALJIC instruction given to the jury. "CALJIC instructions that were legally correct and adequate on December 31, 2005, did not become invalid statements of the law on January 1, 2006. Nor did their wording become inadequate to inform the jury of the relevant legal principles or too confusing to be understood by jurors. The Judicial Council's adoption of the CALCRIM instructions simply meant they are now endorsed and viewed as superior. No statute, Rule of Court, or case mandates the use of CALCRIM instructions to the exclusion of other valid instructions." (*People v. Thomas*, *supra*, 150 Cal.App.4th at pp. 465-466.)

However, we do agree with defendants on two points. First, the instruction given to the jury in this case, CALJIC No. 3.41, omits "the basic legal definition of cause." This is because that definition was provided in CALJIC No. 3.40, which was not given to the jury. (footnote 8 omitted). Second, the instruction given to the jury used the term "proximate cause," which does not appear in either the current CALCRIM instruction or the post-1992 CALJIC version of the instruction. This is

12

because our Supreme Court has held use of the term "proximate cause" in such an instruction "may mislead jurors, causing them . . . to focus improperly on the cause that is spatially or temporally closest to the harm." (*Mitchell v. Gonzales* (1991) 54 Cal.3d 1041, 1052; *People v. Roberts* (1992) 2 Cal.4th 271, 313.) However, as we explain immediately below, the error was harmless under any standard.

In this case, as in *People v. Sanchez* (2001) 26 Cal.4th 834, "it is proximate causation, not direct or actual causation, which, together with the requisite culpable mens rea (malice), determines [defendants'] liability for murder." (*Id.* at p. 845.) Here, there was no dispute Ellison died of a single gunshot wound. This was the direct, but-for cause of death. Overwhelming evidence established both Adam and Isaac fired into Ellison's car. Who fired the fatal shot is irrelevant. As our Supreme Court explained: "A person can proximately cause a gunshot injury without personally firing the weapon that discharged the harm-inflicting bullet. For example, in *People v. Sanchez*, *supra*, 26 Cal.4th 834, . . . two persons engaged in a gun battle, killing an innocent bystander. Who fired the fatal bullet, and thus who personally inflicted the harm, was unknown, but we held that the jury could find that *both* gunmen proximately caused the death. (*Id.* at pp. 848–849 . . . .)" (*People v. Bland* (2002) 28 Cal.4th 313, 337.) The same is true here. While the jury should have been instructed with the "direct, natural, and probable consequences" language, we have no doubt the jury reached the same conclusion without it, i.e., the act of firing the fatal shot caused Ellison's death. Then, under the instruction that was provided, the jury properly concluded both Adam and Isaac proximately caused the death regardless of who fired the fatal shot. Moreover, use of the term "proximate cause" in the instruction, while improper, could only have benefitted defendants by potentially misleading jurors that proximate cause has a "'physical or temporal nearness'" requirement that does not exist in the law. (*People v. Bland*, *supra*, 28 Cal.4th at p. 338.) As for Jesse, liability for murder turned on principles of aiding and abetting, on which the jury was appropriately instructed. Thus, any instructional error was manifestly harmless.

Nevertheless, defendants argue there is evidence the occupants of the smaller car in front of the Explorer may have also fired upon Ellison's car, and one of them might have fired the fatal shot. While there is some evidence shots may have also been fired from the smaller car, this would not undermine our conclusion Adam and Isaac, by firing their own bullets into Ellison's car, also proximately caused Ellison's death. Stated simply, assuming there were three gunmen instead of two, who fired the fatal bullet is still unknown, and the jury could find *all three* gunmen proximately caused the death. Nor are we persuaded by the argument, made in Adam's opening brief, it would be speculative to conclude that "defendants were acting in concert with the occupants of the other vehicle, or that the occupants of the two vehicles even knew each other." If, as defendants suggest, both the Explorer and the smaller lead car fired upon Ellison's car as it pulled into the driveway, a reasonable inference is that the two vehicles were acting in concert. Adam's trial counsel acknowledged as much when he argued in closing that the smaller car was "a companion car" containing "friends of theirs." Moreover, defendants cite no authority for the proposition that the two cars had to act in concert in order for Adam and Isaac to have proximately caused Ellison's death by also firing upon his car. Indeed, in *People v. Sanchez*, *supra*, 26 Cal.4th 834, the two gunmen who were found to have proximately caused the death of the innocent bystander were not acting in concert, but rather in

13

opposition to each other. (*Id*. at pp. 840-841.)

> We conclude that while the trial court erred by instructing the jury with an out-of-date version of CALJIC No. 3.41, rather than the preferred bracketed portions of CALCRIM No. 520 on causation, the error was manifestly harmless under any standard of prejudice.

ECF No. 14-1, pgs. 25-48.

2.    Petitioner's Claim

In his federal petition, Petitioner contends the state court's determination that any error was harmless was an unreasonable application of clearly established federal law.  According to Petitioner:

> It is clearly established that in a criminal trial, the State must prove every element of the offense, and a jury instruction violates due process if it fails to give effect to that requirement. *Sandstrom* v. *Montana,* 442 U.S. 510, 520-521, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979). The question is "'whether the ailing instruction ... so infected the entire trial that the resulting conviction violates due process.'" *Estelle* v. *McGuire,* 502 U.S. 62, 72, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991) (quoting *Cupp* v. *Naughten,* 414 U.S. 141, 147, 94 S.Ct. 396, 38 L.Ed.2d 368 (1973)). The error in this case violated Adam's federal constitutional right to have the jury determine every material issue presented by the evidence, removed an essential element of the crime charged from the jury's consideration, and denied Adam's right to due process and a fair trial under the Fifth and Fourteenth Amendments to the United States Constitution. *In re Winship* (1970) 397 U.S. 358, 364 [90 S.Ct. 1068, 25 L.Ed.2d 368]; *Rose* v. *Clark* (1986) 478 U.S. 570, 583 [106 S.Ct. 3101, 92 L.Ed.2d 460].
>
> The applicable standard is therefore that of *Brecht* v. *Abrahamason* [sic] (1993) 507 U.S. 619, under which a habeas petitioner may obtain relief only upon a showing that an error "had substantial and injurious effect or influence in determining the jury's verdict" – [Citations.]"(*Id.* at p. 623) The "[h]abeas court cannot only ask whether it thinks the petitioner would have been convicted even if the constitutional error had not taken place." (*Id.* at 642, fn. Omitted (conc. Opn. Of Stevens, J.).) Rather, the court must closely focus on the critical question of whether the error impermissibly influenced the jury. (*Id.,* at p 642-643.)
>
> The evidence was that Ellison was killed by a single gunshot wound. (1RT 153, 277.) The single bullet removed from Ellison during autopsy was described as a nominal .38, similar to a nine-millimeter. (2RT 444- 445; 3RT 866.)
>
> There was evidence that members of the WOJ\1P gang had made threats to Ellison because Ellison had testified against one of their members, and that Ellison had acquired a weapon because he was in fear for his life. (1RT 152,154,170,184,187,189, 190-194, 196-197, 225.) There was evidence that the occupants of two separate vehicles fired toward Ellison's Taurus. (1RT 226,228,227; 2RT 377-379, 387.) There was evidence that a red or burgundy car was either in front of or behind appellant's Ford Explorer, and that the occupants of that vehicle were firing at least two weapons toward the Taurus. (1RT 222, 226, 228, 227; 2RT 357, 377-379, 387,465, 479, 484-485; 3RT 630.) There was no

14

evidence that the petitioners had any connection to the occupants of that vehicle.

According to a ballistics expert, there were a minimum of four firearms responsible for the ballistics evidence at the scene. (4RT 906.) There was evidence of a .380 auto caliber weapon that was not linked to either Latrele Neal or to appellants. (3RT 867-868, 885, 887.) A .380 caliber bullet was found in the Taurus headliner. (3RT 738; Exh. 139.) Based on the location of the .40 caliber casings, Latrele Neal was determined to have been firing a .40 caliber weapon. (1RT 278-280; 2RT 320, 592.) All of the .40 caliber casings found at the scene were identified as being fired from the same gun. (3RT 852-853, 874; Exhs. 189-A & 190- A.)

Two weapons were linked to the vehicle in which Adam was a passenger, a ten- millimeter Colt pistol, and an unidentified nine-millimeter weapon. (1RT 143-145, 167; 2RT 336-337, 379, 520-521, 524, 526-529, 536; 3RT 601,603, 670-672, 843-845; Exhs. 202-A & 226.) Two different types of gunshot residue were found on the hands of Adam and Isaac Vasquez. (3RT 755-759; 803-806, 809; Exhs 228,229, 230.) There were eight ten-millimeter casings at the scene of the shooting, two of which were determined to have been fired by the recovered gun. (3RT 843-845, 851- 852, 867; AugCT 177-178 [evidence items 7, 8, 9, 11, 14, 15, 16, & 17]; Exhs. 202, 203, 227.) Nine-millimeter casings found in appellant's vehicle with the head stamp "RP," were determined to have been fired from the same weapon as two of the casings at the scene with the same RP head stamp. (3RT 846-847, 849-851, 880; AugCT 177-178.)

The variety of different brands of nine-millimeter casings at the scene suggested that more than one nine-millimeter weapon had been fired. Four of the six nine-millimeter casings at the scene bore the head stamp "RP." (AugCT 177-178 [ evidence items 1, 2, 5, & 6].) As noted above, only RP casings were linked to petitioner's vehicle. The two additional nine-millimeter casings at the scene bore head stamps of two additional types of ammunition: "FC," and "PMC." (AugCT 177-178) The FC and PMC casings were not microscopically compared to the nine-millimeter casings found in appellant's vehicle. (3RT 846-851, 880; Exh. 227.) There was no evidence to establish whether the autopsy bullet came from a RP brand bullet versus an FC or PMC brand shell.

Latrele Neal, the prosecution's most important witness, who testified regarding the chain of events of the shooting, including the issue of who had fired first, had severe credibility problems. Neal admitted continuing to lie to authorities even after receiving an immunity agreement. (2RT 352, 363-368.) At the time of the charged crimes, Neal was on parole. (2RT 3 62, 3 81-3 82.) At trial he was in custody for a subsequent assault. (2RT 362-393.) Neal had a motive to lie to protect himself. The evidence suggested that Neal himself may have instigated the shooting by pointing a weapon at the vehicles in the street before they rolled down their windows and produced guns. (1RT 143-145, 164-165, 167, 176, 178; 2RT 570-571, 580-581.) In addition, Neal ran away from the scene, hid the gun, and instructed others to hide his involvement. (1RT 168-169, 182; 2RT 361, 363, 379, 383-386, 392, 462-463, 472, 474, 588.) Neal admitted feeling responsible for Ellison's death. (2RT 392.)

Other prosecution witnesses had credibility problems as well. Jettie Boyd and her mother Sharon Boyd lied to police about Latrele Neal's involvement, and were caught appearing to discuss hiding ballistics evidence. (1RT 153-155, 159-160; 2RT 315-316, 324-325, 569, 577, 579 581; AugCT 189 [Exh. 201].) Bernard Maxwell testified that he was drunk

at the time of the shooting. (2RT 481-482.) Wilkens Owens, who was a passenger in the Taurus, appeared to be tampering with ballistics evidence at the scene, and ultimately took the Fifth and refused to testify. (1RT 279-280; 4RT 1036-1037.)

There was evidence that a person in a second car was shooting at the car in which the decedent was seated. There was evidence in the decedent's car of three types of bullets. These were a nine-millimeter bullet in the windscreen, a nine-millimeter bullet in Ellison's body, a .380 caliber bullet in the head liner, and a possible ten-millimeter bullet in the rear tire of the Taurus. (2RT 326-327, 339-340, 444-445; 3RT 706, 734-735, 863, 866-868, 885-887, 912; Exhs. 72, 141, 142, 143.) The prosecution proved only two types of bullets were used by the two guns in defendant's vehicle. Therefore, the most reasonable inference was that the .380 bullet was fired by the occupants of the other vehicle. It can also be inferred that there was at least one other nine-millimeter weapon fired from the sedan, based on the presence of two additional brands of nine-millimeter casings other than the brand connected to appellant's vehicle. It could not be determined whether the projectile that struck the decedent was fired by one of the two guns in the defendants' vehicle. There was no evidence that the defendants were acting in concert with the occupants of the other vehicle, or that the occupants of the two vehicles even knew one another. Based on all of these facts, had the jury been properly instructed on causation, it would have had a reasonable doubt as to whether the Adam's act legally caused the decedent's death and, at the most, would have convicted him of attempted murder.

The instructions given expanded Adam's potential liability for acts that he did not personally do, and acts to which he was not an accomplice. The instructions permitted the jury to conclude that Adam was legally responsible for Ellison's death even if Ellison was killed by a bullet fired from the other car, despite the lack of evidence that there was any connection between the defendants and the occupants of the other vehicle. The evidence did not foreclose the possibility that the occupants of the other car were firing at Ellison's vehicle for their own reasons, independent of, and unrelated to the reason shots were fired from Adam's vehicle. Under the causation instructions given, Adam could have been deemed to cause the homicide by virtue of participating in the gun battle without regard to whether appellant shared the intent of, or was an accomplice of the actual shooter, and without regard to whether anyone in petitioner's vehicle actually fired the shot that caused Ellison's death, and without regard to whether Adam's conduct instigated the gunfire.

As given, the concurrent causation instructions also undermined Adam's defense by allowing the jury to consider provocative and aggressive acts by Ellison, Neal, and their compatriots, as proof of causation, rather than as evidence supporting the defense of self-defense. The jury could have believed that petitioners acts, together with Neal's provocative acts, established concurrent causation. The jury was never informed that to find Adam culpable for Ellison's death, they had to find that Adam's conduct set in motion an uninterrupted chain of events that produced, as a direct, natural and probable consequence, Ellison's death, and without which his death would not have occurred. A properly instructed jury could have had a reasonable doubt as to whether Adam's conduct was essential to Ellison's death.

///

16

The prosecution closing argument added to the confusion by suggesting to the jury that proximate cause was a species of legal fiction designed to circumvent the need for cause in fact. Specifically, the prosecutor argued as follows:

> I'm going to fly through some of these instructions a little bit and then we're going to get to proximate cause, because you're probably all thinking this: Well, wait a minute, one bullet killed Deandre, right? One bullet, a nine-millimeter. How can they both be found guilty and found to have personally used a gun and proximately caused that death? And I'm going to tell you in a minute.
> you're going to get it in your instructions. Essentially, it's this: Over the years certainly the laws have adapted, and the laws recognize that if two people are firing a gun at the same person and one bullet hits 'em, and we can't determine whose gun that was, do you just let them both walk? That doesn't make sense. It didn't make sense years ago, it doesn't make sense now, and the law deals with that by proximate cause.
> So if they are both substantial factors, if you've got two people who are firing a gun, at multiple people for the attempt murder, and at Deandre with the intent to kill, and they're both firing - and how do you fire a gun again and not intend to kill? But if they're both shooting- and we don't know who had the nine and who had the ten, but we know they were both shooting at the same time, then they're both proximately - they both proximately caused that death, they're a substantial factor. Because, again, common sense, the law isn't going to excuse somebody because they were lucky enough to either have a bullet go through and through so we don't know what bullet killed him, or to toss the guns and nobody knows which one had which gun, even though we know they both did.
> It does not matter who fired the fatal shot so long as they were both substantial factors. If you doubt what I'm saying, you can send a note out and ask the judge.

(4RT 1155-1157.)

For all the reasons discussed above, the erroneous omission of instructions on cause in fact, and the use of a confusing and incomplete instruction on concurrent causes, impermissibly influenced the trial and the conviction violated Adam's due process and was not harmless error.

ECF No. 1, pgs. 23-29.

/ / /

/ / /

/ / /

/ / /

3.      Respondent's Answer

Respondent argues the state court's determination was reasonable.  See ECF No. 19, pg. 17.  According to Respondent:

First, to the extent Petitioner challenges the state court's finding that the trial court properly instructed the jury with CALJIC rather than CALCRIM instructions, he raises only an issue of state law, and is not cognizable on federal habeas review. *Pulley v. Harris*, 465 U.S. 37, 41, (1984). A Petitioner cannot convert a state-law claim of instructional error into a federal claim simply by labeling it a violation of due process. *See Poland v. Stewart*, 169 F.3d 573, 584 (9th Cir. 1999) (a petitioner may not transform a state law issue into a federal one merely by asserting a violation of due process).

Further, to the extent Petitioner argues that the state court determined that the instructions violated the constitution before finding the error harmless beyond a reasonable doubt, he misinterprets the state court ruling. The state court did not determine that the incomplete causation instructions resulted in constitutional error. Instead, the state court found that the instructions had no impact on the outcome of the trial, thus, there was no reasonable likelihood the jurors applied the challenged instructions in an unconstitutional manner. Accordingly, there was no constitutional error. *Estelle v. McGuire*, 502 U.S. 62, 72-73 (1991) (issues relating to jury instructions do not present a federal question unless the error "by itself so infected the entire trial that the resulting conviction violates due process[.]'" ); *see Henderson v. Kibbe*, 431 U.S. 145, 154 (1977); see also *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974) ("'[I]t must be established not merely that the instruction is undesirable, erroneous, or even 'universally condemned,' but that it violated some [constitutional right]'"). And a fairminded jurist could possibly have agreed with the state court's reasoning that there was no reasonably likelihood of an unconstitutional application because causation was established when Petitioner fired into the vehicle and the driver died from a single gun shot wound, it was irrelevant to the issue of causation whether Petitioner, his co-defendant, or even a shooter from another car fired the fatal shot, and the use of the term "proximate cause" could only have benefited Petitioner by implying a nonexistent physical or temporal requirement. Accordingly, the Petitioner's collateral challenge to the causation instructions must be rejected because a fairminded jurist could agree with the state court's determination that there was no reasonable likelihood the jurors applied the challenged instructions in an unconstitutional manner. *Estelle*, at 72-73.

But even assuming the state court found the incomplete causation instructions to be harmless constitutional error, its ruling was neither contrary to nor an unreasonable application of established Supreme Court precedent. Generally, the harmless-error test used in collateral proceedings asks whether the alleged federal constitutional error resulted in "actual prejudice" — that is, whether the error had a substantial and injurious effect or influence in determining the jury's verdict. *See Brecht* v. *Abrahamson*, 507 U.S. 619, 637-38 (1993). Thus, "there must be more than a 'reasonable possibility' that the error was harmful." *Davis v. Ayala*, _ U.S. _, 135 S.Ct. 2187, 2198 (2015), citing *Brecht*, 507 U.S at 637. But if the state court analyzed the alleged error under *Chapman v. California*, 386 U.S. 18 (1967), which asks whether the reviewing court can declare a

18

belief that the error was harmless beyond a reasonable doubt, a state court's harmless-error determination is reviewed for reasonableness under § 2254(d). *Davis v. Ayala*, 135 S. Ct. at 2198 ("When a *Chapman* decision is reviewed under AEDPA, 'a federal court may not award habeas relief under § 2254 unless *the harmlessness determination itself* was unreasonable.'" (quoting *Fry v. Pliler*, 551 U.S. 112, 119 (2007))); *see also Mitchell v. Esparza*, 540 U.S. 12, 17-18 (2003) (per curiam) (reviewing whether state court's determination of harmless error under *Chapman* was "objectively unreasonable" under § 2254(d)). Accordingly, *Brecht* does not "somehow abrogate[] the limitation on federal relief that § 2254(d) plainly sets out." *Davis v. Ayala*, 135 S. Ct. at 2198. Rather, when a state court adjudicates the claim on the merits, "the *Brecht* test subsumes the limitations imposed by AEDPA." *Id*. at 2199. Under those limitations, relief is unavailable unless "no fairminded jurist" could concur with the state court's harmlessness decision. *Richter*, 562 U.S. at 101. Thus, while a federal habeas court need not "formal[ly]" apply both *Brecht* and "AEDPA/*Chapman*," AEDPA nevertheless "sets forth a precondition to the grant of habeas relief." *Davis v. Ayala*, 135 S. Ct. at 2198; *Fry v. Pliler*, 551 U.S. at 119-20.

Here, a fairminded jurist could agree with the state court's finding that any instructional error was harmless under any standard for the same reasons the cited above — causation was established when Petitioner fired into the vehicle and the driver died from a single gun shot wound regardless of whether Petitioner, his co-defendant, or even a shooter from another car fired the fatal shot. Further, the term "proximate cause" could only have benefited Petitioner by implicitly requiring a physical or temporal nearness that does not otherwise exist. Thus, the state court reasonably denied Petitioner's instructional-error claim even upon a finding of constitutional error.

ECF No. 19, pgs. 20-22.

4.    <u>Analysis</u>

As framed by the petition, the narrow issue before this Court is whether the state court's harmless error determination is either contrary to or based on an unreasonable application of clearly established federal law.

Applying <u>Brecht</u> because this is a case on collateral review, this Court cannot say that the state court's determination is contrary to or based on an unreasonable application of federal law.  The state court concluded that, under either of the various causation instructions at issue, the evidence showed that all three gunmen – which includes Petitioner – caused the victim's death.  Notably, as the state court also observed, Petitioner's argument on direct appeal suggested the occupants of both vehicles – which, again, includes Petitioner – fired upon Ellison's car.  Other evidence of guilt included: a description of the Explorer; the Explorer was found not far from the crime scene; the driver of the Explorer led police on a high-speed chase;

1   Petitioner attempted to flee on foot; during the vehicle chase, two handguns were thrown from the

2   explorer; police found a 10-millimeter handgun along the chase route; police also found eight 10-

3   millimeter casings which appeared to have been fired by this gun; Isaac admitted he threw a 9-

4   millimeter handgun from the Explorer during the vehicle chase; two 9-millimeter casings were

5   found in the Explorer and appeared to have been fired by the same gun that left casing found at

6   the crime scene; and gunshot residue analysis.

7       Simply put, the trial court's error in using an outdated instruction had no effect, let

8   alone a substantial and injurious effect, on the jury's verdict.

9       **B.**     **Hearsay**

10      In claim 4, Petitioner contends the trial court allowed inadmissible testimonial

11  hearsay, in violation of his rights under the Confrontation Clause of the Sixth Amendment.  See

12  ECF No 1, pgs. 40, 44.

13      The Confrontation Clause protects a defendant from unreliable hearsay evidence

14  being presented against him during trial.  See U.S. Constitution, Amendment VI.  Prior to the

15  Supreme Court's decision in Crawford v. Washington, 541 U.S. 36 (2004), the admission of

16  hearsay evidence did not violate the Confrontation Clause where the hearsay fell within a firmly

17  rooted exception to the hearsay rule or otherwise contained "particularized guarantees of

18  trustworthiness."  Lilly v. Virginia, 527 U.S. 116, 123-24 (1999); Ohio v. Roberts, 448 U.S. 56,

19  66 (1980).  In Crawford, however, the Supreme Court announced a new rule:  Out-of-court

20  statements by witnesses not appearing at trial that are testimonial are barred under the

21  Confrontation Clause unless the witnesses are unavailable and the defendant had a chance to

22  cross-examine, regardless of whether such statements are deemed reliable by the trial court.  See

23  541 U.S. at 51.  If error occurred, the next question is whether such error was harmless.

24  See Bockting v. Bayer, 399 F.3d 1010, 1022 (9th Cir. 2005) (applying harmless error analysis).

25      While the Supreme Court in Crawford "le[ft] for another day any effort to spell out

26  a comprehensive definition of 'testimonial,'" the Court provided some guidance. 541 U.S. at 68.

27  The Court observed that "[a]n accuser who makes a formal statement to government officers

28  bears testimony in a sense that a person who makes a casual remark to an acquaintance does not."

1    Id. at 51; see also Davis v. Washington, 547 U.S. 813 (2006) (holding that law enforcement

2    interrogations directed at establishing the facts of a past crime or in order to identify the

3    perpetrator are testimonial); see also See Michigan v. Bryant, 131 S.Ct. 1143 (2011) (discussing

4    when interrogation is testimonial).

5              1.      State Court's Determination

6              In rejecting this claim, the California Court of Appeal stated:

7                      This conclusion [striking the gang enhancement] makes it
       unnecessary to address defendants' additional, and arguably meritorious,
8      assertion that the trial court prejudicially erred and violated their
       constitutional right of confrontation by admitting expert gang testimony
9      concerning the basis for the expert's conclusions they were active Norteño
       gang members. (See *People v. Sanchez* (2016) 63 Cal.4th 665, 670-671
10     ["case-specific statements related by the prosecution expert concerning
       defendant's gang membership constituted inadmissible hearsay" and
11     "[s]ome of those hearsay statements were also testimonial and therefore
       should have been excluded under *Crawford*[ *v. Washington* (2004) 541
12     U.S. 36]"].)
                       And while defendants also assert such a confrontation violation
13     would require reversal of their underlying convictions, as well as the gang
       enhancements, we disagree. The evidence establishing their guilt of the
14     underlying crimes was very strong, as we explain more fully later in this
       opinion. Setting aside any testimonial hearsay conveyed to the jury
15     through the gang expert, we would conclude beyond a reasonable doubt
       the jury would have convicted defendants of the underlying crimes.
16
              ECF No. 14-1, pg. 4, n.1; ECF No. 14-2, pg. 73.
17

18            On habeas review, the Superior Court denied relief on this claim in February 2018,

19    citing the Court of Appeal's opinion on rehearing as modified.  See ECF No. 14-10, pgs. 1-2.

20            2.      Petitioner's Claim

21            In his federal petition, Petitioner argues the state court's determination was

22    contrary to Crawford.  See ECF No. 1, pg. 44.  Petitioner contends:

23                    The Confrontation Clause of the Sixth Amendment provides: "In
       all criminal prosecutions, the accused shall enjoy the right ... to be
24     confronted with the witnesses against him." In *Crawford v. Washington,
       supra,* 541 U.S. at p. 59, the United States Supreme Court held that
25     testimonial statements of declarants absent at trial are admissible
       only where 1) the declarant is unavailable, and 2) only where the defendant
26     had a prior opportunity to cross examine.
                       Applying *Crawford* to the present case, it is clear much if not all of
27     the "basis" evidence summarized above was testimonial. A statement
       made in response to police questioning is testimonial when its "primary
28

                                            21

purpose" is not to respond to an ongoing emergency but instead "to establish or prove past events potentially relevant to later criminal prosecution." *Davis v. Washington,* 54 7 U.S. 813, 822 (2006). "Involvement of government officers in the production of testimony with an eye toward trial presents unique potential for prosecutorial abuse - a fact borne out time and time again throughout history." *(Crawford,* 541 U.S. at 56, fn. 7.)

Most if not all of the basis evidence identified above was information contained in reports authored by law enforcement officers for an investigatory or prosecutorial purpose. The statements thus conveyed were testimonial. A police officer may not, consistent with the Confrontation Clause, convey the contents of another officer's report to a jury. *Bullcoming* v. *New Mexico,* 131 S.Ct. 2705, 2714-2715, 2717 (2011). The admission of the expert "basis" evidence summarized above violated Adam's rights under the Confrontation Clause of the Sixth Amendment.

ECF No. 1, pgs. 44-45.

Petitioner also argues the error was not harmless:

The Court of Appeal's conclusion that the jury would have convicted the petitioner beyond a reasonable doubt despite any error is simply an assessment that the Confrontation Clause violation was harmless. Confrontation Clause errors are subject to harmless error analysis. *Slovik v. Yates,* 556 F.3d 747, 755 (2009). In habeas actions, this court engages a de novo review to determine whether or not the constitutional error had a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht at* 623.

In this case, it is impossible to say that the improperly admitted basis testimony did not have a substantial and injurious influence in determining the jury's verdict. The evidence supporting the defense theory that Neal actually fired first (4RT 1171) [trial counsel's closing argument]- was strong. There was no evidence that this was some sort of pre-planned gang hit, or that the defendants had any idea concerning the identity of the Taurus's occupants before Ellison unexpectedly turned into his driveway directly in front of the SUV and/or a companion car, causing the approaching SUV to slow down.

Jettie herself admitted that when she first saw Neal emerging from the Taurus, as it was still moving and it looked as though Neal was holding a gun. (1RT 165-166; 2RT 570, 580-581.) Neal himself testified that he saw Ellison grabbing for his gun *before* Neal first emerged from the car. (2RT 370-373.) It was uncontested that both Ellison and Neal were on the alert for trouble and that Ellison had obtained the .40 caliber handgun precisely because he was expecting to be attacked. (1RT 152-153, 170; 2RT 394-395, 402-403.)

Jurors were never told that they could not consider the basis evidence for its truth. Instead, the jury was told that it could consider the evidence of gang activity, without exception, in determining issues of intent, motive, and belief in the need to defend. The jury was told it could consider the evidence of gang activity, without exception, "when you consider the facts or information relied upon by an expert witness in reaching his opinion." (3CT 766; 4RT 941; 5RT 1312-1313.) Jurors were told that they *must* decide whether the basis evidence was true and

accurate. (3CT 753; 5RT 1293 ["you must decide whether information on which the expert relied was true and accurate"].)

Nothing in the record suggests that jurors did not heed the foregoing instructions and rely upon the basis evidence for its truth in evaluating whether the defendants harbored the wrongful intent necessary for conviction of each crime and enhancement allegation. While jurors were also told that facts from reports or records made by others could be used only to evaluate the expert's opinion "and not as independent evidence of their existence," it is difficult to imagine what a lay juror would make of an instruction telling the juror both that s/he *must* decide whether or not a certain fact was true and accurate, while at the same time not considering that fact as independent evidence of the fact's existence. "Language that merely contradicts and does not explain a constitutionally infirm instruction will not suffice to absolve the infirmity. A reviewing court has no way of knowing which of the two irreconcilable instructions the jurors applied in reaching their verdict." *Francis v. Franklin,* 471 U.S. 307,322 (1984). It is highly unlikely that a reasonable juror would conclude from the instructions as a whole that the basis evidence could not be considered for its truth.

In sum, the expert "basis" evidence impermissibly influenced the jury's determination of whether Adam acted with the requisite mental state as to each of the charged crimes.

ECF No. 1, pgs. 45-47.

3.      Respondent's Answer

Respondent argues the state court's determination was reasonable.  See ECF No. 19, pg. 22.  Specifically, Respondent asserts:

The state court's harmless-error finding was neither contrary to nor an unreasonable application of established Supreme Court precedent. As stated above, the harmless-error test used in collateral proceedings asks whether the alleged federal constitutional error resulted in "actual prejudice" — that is, whether the error had a substantial and injurious effect or influence in determining the jury's verdict. *See Brecht* v. *Abrahamson*, 507 U.S. at 637-38. But "When a *Chapman* decision is reviewed under AEDPA, 'a federal court may not award habeas relief under § 2254 unless *the harmlessness determination itself* was unreasonable.'" *Davis v. Ayala*, 135 S.Ct. at 2198, quoting *Fry v. Pliler*, 551 U.S. 112, 119 (2007))); *see also Mitchell v. Esparza*, 540 U.S. 12, 17-18 (2003) (per curiam) (reviewing whether state court's determination of harmless error under *Chapman* was "objectively unreasonable" under § 2254(d)). Again, relief is unavailable unless "no fairminded jurist" could concur with the state court's harmlessness decision. *Richter*, 562 U.S. at 101. Thus, while a federal habeas court need not "formal[ly]" apply both *Brecht* and "AEDPA/*Chapman*," AEDPA nevertheless "sets forth a precondition to the grant of habeas relief." *Davis v. Ayala*, 135 S. Ct. at 2198; *Fry v. Pliler*, 551 U.S. at 119-20.

Under this standard, a "fairminded jurist" could concur with the state court's finding that any Confrontation Clause violation was harmless. Because the state court had already struck Petitioner's gang enhancements on a separate ground, the allegedly unconstitutional gang evidence could

23

not affect the now non-existent gang enhancements. Further, the state court reasonably determined that the allegedly unconstitutional gang evidence had no effect on the jury's verdict on the underlying offenses in light of the overwhelming evidence of Petitioner's guilt. Specifically, Petitioner and his co-defendants opened fire on a parked vehicle containing five people, killing the driver. Petitioner and his co-defendants then fled the scene, eventually leading the police on a high-speed chase before crashing at an intersection and attempting to flee on foot. Along the chase route, authorities recovered a 10-millimeter handgun, a magazine for a 9-millimeter handgun, and several unfired 9-millimeter rounds. Although the police did not locate the 9-millimeter handgun itself, Petitioner's co-defendant admitted that it too had been thrown from the vehicle. Further, 10-millimeter casings found at the murder scene appeared to have been fired by the recovered 10-millimeter handgun, and 9-millimeter casings found at the murder scene appeared to have been fired by the same weapon as 9-millimeter casings found in Petitioner's vehicle. Finally, gunshot residue tests confirmed that both Petitioner and his codefendant had recently fired a weapon. (Lod. Doc. 1 at 6-8.) In light of this overwhelming evidence supporting Petitioner's murder and attempted murder convictions, the state court reasonably concluded that any federal error resulting from the admission of testimonial evidence of Petitioner's gang status was harmless beyond a reasonable doubt. *See Davis v. Ayala*, 135 S. Ct. at 2198-99; *Brecht v. Abrahamson*, 507 U.S. at 637-38.

ECF No. 19, pgs. 23-24.

    4.    <u>Analysis</u>

Again, the narrow issue is whether the state court's determination that any Confrontation Clause violation was harmless is contrary to or based on an unreasonable application of the law.  And again, the Court applies <u>Brecht</u> because this is a case on collateral review.[2]  Under this standard, the Court finds that federal habeas relief is unavailable.

Petitioner contends the jury's verdict was infected by the improperly admitted gang evidence and, as such, the trial court's error in admitting the evidence had a substantial and injurious effect on the verdict.  In support of this contention, Petitioner cites instructions telling the jury it may consider evidence of gang activity in evaluating other evidence of guilt.  This argument is logically flawed in that "may" does not mean "must."  Though the jury was permitted to include evidence of gang activity, some of which may have been improper testimonial hearsay, as it weighed other evidence of guilt, Petitioner points to nothing in the record to suggest the jury

---

[2]    In his brief, Respondent references the "harmless beyond a reasonable doubt" standard for cases on direct review, which is not applicable here.

1  believed it was required to do so.  In other words, improperly admitted evidence of Petitioner's

2  gang activity could have had no effect at all.

3     To the point, the state court assessed the other inculpatory facts adduced at trial,

4  which are discussed above and, for purposes of this Court's review, presumed true.  As discussed

5  above, the state court noted in particular that the evidence supported a jury finding that the

6  occupants of both vehicles – which included Petitioner – caused the victim's death.  Additionally,

7  it is clear the jury rejected Petitioner's self-defense argument.  Given the sufficiency of other

8  evidence showing guilt – notably the incriminating forensic evidence relating to the guns used in

9  the crimes – this Court cannot find the state court's harmless error determination is either contrary

10  to or based on an unreasonable application of the <u>Brecht</u> "substantial and injurious effect"

11  standard.

12     **C.**  **Cruel and Unusual Punishment**

13     In his sixth claim, Petitioner asserts his sentence, constitutes cruel and unusual

14  punishment, in violation of his rights under the Eighth Amendment.  <u>See</u> ECF No. 1, pg. 53.

15     In <u>Lockyer v. Andrade</u>, the Supreme Court concluded that habeas relief was not

16  available on a claim that two consecutive sentences of 25 years to life in prison constituted cruel

17  and unusual punishment because there is no clearly established Supreme Court precedent.  <u>See</u>

18  538 U.S. 63, 72 (2003).  The Court stated:

19      Our cases exhibit a lack of clarity regarding what factors may indicate

20      gross disproportionality. . . .  [¶] Thus . . . the only relevant clearly
    established law amenable to the "contrary to" or "unreasonable application

21      of" framework is the gross disproportionality principle, the precise
    contours of which are unclear, applicable only in the "exceedingly rare"

22      and "extreme" case.

    <u>Id.</u> at 72-73.

23

24  In <u>Rummel v. Estelle</u>, the Supreme Court upheld an indeterminate life sentence where the

25  defendant had obtained $125.70 by false pretenses and had two prior serious felony convictions.

26  <u>See</u> 455 U.S. 263, 285 (1980).  In <u>Harmelin v. Michigan</u>, the Court upheld an indeterminate life

27  sentence where the defendant possessed 650 grams of cocaine.  <u>See</u> 501 U.S. 957, 1009 (1983).

28  And in <u>Ewing v. California</u>, the Court rejected an Eighth Amendment argument where the

1  defendant had been sentenced to 25 years to life for grand theft with prior serious felony

2  convictions.  See 538 U.S. 11, 30-31 (2003).

3      1. State Court's Determination

4    In rejecting this claim, the California Court of Appeal stated:

5      Adam and Isaac also assert the trial court's imposition of a
sentence the functional equivalent of LWOP amounts to cruel and unusual
6  punishment in violation of the Eighth Amendment to the United States
Constitution. In light of our Supreme Court's recent decision in *Franklin*,
7  *supra*, 63 Cal.4th 261, we conclude the claim is moot. Moreover, based on
the procedural context of this case, we need not order the limited remand
8  that was ordered in *Franklin*.

9            * * *

10      Adam and Isaac were 17 and 16 years old, respectively, when they
opened fire on Ellison and his companions, killing Ellison. Isaac was also
11  developmentally disabled. Isaac's sentencing memorandum argued the
probation department's recommendation that the trial court impose an
12  indeterminate term of 170 years to life, plus a consecutive determinate
term of 37 years 4 months, "on a mentally impaired minor with a severely
13  disadvantaged upbringing, including a drug-addicted mother, absent father
figure, periods of homelessness, and an abusive and chaotic family life"
14  would violate the Eighth Amendment. Adam's sentencing memorandum
similarly argued the probation department's recommendation that the trial
15  court impose such a sentence "on a boy of only 17 years of age at the time
of the offense, constitutes cruel and unusual punishment in violation of the
16  Eighth Amendment."
    The trial court sentenced Adam and Isaac to serve an aggregate
17  indeterminate prison term of 120 years to life plus a consecutive
determinate term of 9 years 4 months. This sentence was comprised of the
18  following: 20 years to life for second-degree murder by means of shooting
a firearm from a motor vehicle with intent to inflict great bodily injury (§§
19  187, 190, subd. (d)), plus 25 years to life for the greatest firearm
enhancement attached to that crime (i.e., personally and intentionally
20  discharging a firearm causing great bodily injury or death (§ 12022.53,
subd. (d)), plus a consecutive determinate term of 9 years 4 months (4
21  consecutive terms of 2 years 4 months (one-third the middle term of 7
years)) for the attempted murders (§§ 187, 664, subd. (a)), plus *3*
22  additional terms of 25 years to life for the same firearm enhancement
attached to *3* of the attempted murders. The trial court ran *one* of these 25-
23  years-to-life firearm enhancements concurrently "in light of the
constitutional scheme argued by defense."

24            * * *

25

26      The Eighth Amendment to the United States Constitution prohibits
"cruel and unusual punishments" and "contains a 'narrow proportionality
27  principle' that 'applies to noncapital sentences.'" (*Ewing v. California*
(2003) 538 U.S. 11, 20 [123 S.Ct. 1179, 155 L.Ed.2d 108] quoting
28  *Harmelin v. Michigan* (1991) 501 U.S. 957, 996-997 [111 S.Ct. 2680, 115
L.Ed.2d 836].) This constitutional right "'flows from the basic "precept

of justice that punishment for crime should be graduated and proportioned"" to both the offender and the offense." (*Miller v. Alabama* (2012) 567 U.S. ___, ___ [132 S.Ct. 2455, 2458, 183 L.Ed.2d 407] (*Miller*), quoting *Roper v. Simmons* (2005) 543 U.S. 551, 560 [125 S.Ct. 1183, 161 L.Ed.2d 1].)

In *Graham v. Florida* (2010) 560 U.S. 48 [130 S.Ct. 2011, 176 L.Ed.2d 825] (*Graham*), the United States Supreme Court held the Eighth Amendment "prohibits a State from imposing a life without parole sentence on a juvenile nonhomicide offender." (*Id*. at p. 75.) The court explained: "As compared to adults, juveniles have a '"lack of maturity and an underdeveloped sense of responsibility"'; they 'are more vulnerable or susceptible to negative influences and outside pressures, including peer pressure'; and their characters are 'not as well formed.' [Citation.] These salient characteristics mean that '[i]t is difficult even for expert psychologists to differentiate between the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption.' [Citation.] Accordingly, 'juvenile offenders cannot with reliability be classified among the worst offenders.' [Citation.] A juvenile is not absolved of responsibility for his [or her] actions, but his [or her] transgression 'is not as morally reprehensible as that of an adult.' [Citation.]" (*Id*. at p. 68.) The court also explained that "defendants who do not kill, intend to kill, or foresee that life will be taken are categorically less deserving of the most serious forms of punishment than are murderers," and therefore, "when compared to an adult murderer, a juvenile offender who did not kill or intend to kill has a twice diminished moral culpability. The age of the offender and the nature of the crime each bear on the analysis." (*Id*. at p. 69.)

Turning to the severity of an LWOP sentence, the court explained such a sentence "deprives the convict of the most basic liberties without giving hope of restoration, except perhaps by executive clemency – the remote possibility of which does not mitigate the harshness of the sentence," and noted this is "an especially harsh punishment for a juvenile," who "will on average serve more years and a greater percentage of his [or her] life in prison than an adult offender." (*Graham*, *supra*, 560 U.S. at pp. 69-70.) Finally, the court explored the penological justifications for such a sentence and concluded them to be "not adequate to justify life without parole for juvenile nonhomicide offenders." (*Id*. at p. 74.) However, the court was also careful to point out the Eighth Amendment "does not require the State to release that offender during his [or her] natural life," explaining: "Those who commit truly horrifying crimes as juveniles may turn out to be irredeemable, and thus deserving of incarceration for the duration of their lives. The Eighth Amendment does not foreclose the possibility that persons convicted of nonhomicide crimes committed before adulthood will remain behind bars for life. It does forbid States from making the judgment at the outset that those offenders never will be fit to reenter society." (*Id*. at p. 75.)

In *Miller*, *supra*, 567 U.S. ___ [132 S.Ct. 2455, 183 L.Ed.2d 407], the United States Supreme Court held the Eighth Amendment forbids a state from *mandating* the imposition of an LWOP sentence on a juvenile homicide offender. (*Id*. at p. 2469.) The court explained: "Mandatory life without parole for a juvenile precludes consideration of his [or her] chronological age and its hallmark features—among them, immaturity, impetuosity, and failure to appreciate risks and consequences. It prevents taking into account the family and home environment that surrounds him

27

[or her]—and from which he [or she] cannot usually extricate himself [or herself]—no matter how brutal or dysfunctional. It neglects the circumstances of the homicide offense, including the extent of his [or her] participation in the conduct and the way familial and peer pressures may have affected him [or her]. Indeed, it ignores that he [or she] might have been charged and convicted of a lesser offense if not for incompetencies associated with youth—for example, his [or her] inability to deal with police officers or prosecutors (including on a plea agreement) or his [or her] incapacity to assist his [or her] own attorneys. [Citations.] And finally, this mandatory punishment disregards the possibility of rehabilitation even when the circumstances most suggest it." (*Id*. at p. 2468.) The court concluded: "Although we do not foreclose a sentencer's ability to [impose an LWOP sentence on a juvenile] in homicide cases, we require it to take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison." (*Id*. at p. 2469.)

In *People v. Caballero* (2012) 55 Cal.4th 262 (*Caballero*), our Supreme Court held "sentencing a juvenile offender for a nonhomicide offense to a term of years with a parole eligibility date that falls outside the juvenile offender's natural life expectancy," i.e., the "functional equivalent" of an LWOP sentence, "constitutes cruel and unusual punishment in violation of the Eighth Amendment. Although proper authorities may later determine that youths should remain incarcerated for their natural lives, the state may not deprive them at sentencing of a meaningful opportunity to demonstrate their rehabilitation and fitness to reenter society in the future. . . . [T]he sentencing court must consider all mitigating circumstances attendant in the juvenile's crime and life, including but not limited to his or her chronological age at the time of the crime, whether the juvenile offender was a direct perpetrator or an aider and abettor, and his or her physical and mental development, so that it can impose a time when the juvenile offender will be able to seek parole from the parole board. The Board of Parole Hearings will then determine whether the juvenile offender must be released from prison 'based on demonstrated maturity and rehabilitation.'" (*Id*. at pp. 268-269, quoting *Graham*, *supra*, 560 U.S. at p. 75.)

In *Franklin*, *supra*, 63 Cal.4th 261, our Supreme Court held, "just as *Graham* applies to sentences that are the 'functional equivalent of a life without parole sentence' [citation], so too does *Miller* apply to such functionally equivalent sentences," (*Franklin*, at p. 276) such that "a juvenile may not be sentenced to the functional equivalent of LWOP for a homicide offense without the protections outlined in *Miller*." (*Franklin* at p. 276.) However, the court also held the Legislature's passage of SB 260 (2013-2014 Reg. Sess.), which became effective January 1, 2014, and provides juvenile offenders with an opportunity for parole at least by their 25th year of incarceration, renders moot an assertion that "an otherwise lengthy mandatory sentence" was imposed in violation of *Miller, supra,* 132 S.Ct. 2455, at least where the defendant is not excluded from eligibility for such a parole hearing. (*Franklin* at pp. 278-282.)

In so holding, the court explained "the Legislature passed [SB 260] explicitly to bring juvenile sentencing into conformity with *Graham*, *Miller*, and *Caballero*." (*Franklin*, *supra*, 63 Cal.4th at p. 277.) It did so by adding section 3051 to the Penal Code, "which requires the Board [of Parole Hearings] to conduct a 'youth offender parole hearing' during the 15th, 20th, or 25th year of a juvenile offender's incarceration," depending on the length of the offender's "'[c]ontrolling offense.'" (*Franklin* at p.

277, quoting § 3051, subds. (a)(2)(B), (b).) Thus, section 3051 "provides all juvenile offenders with a parole hearing during or before their 25th year of incarceration," unless they come within one of the statute's exclusions, set forth in subdivision (h). (*Franklin,* at p. 278.) While a juvenile offender's original sentence remains operative, "section 3051 has changed the manner in which [that] sentence operates by capping the number of years that he or she may be imprisoned before becoming eligible for release on parole," thereby "supersed[ing] the statutorily mandated sentences" of non-excluded juvenile offenders. (*Id*. at p. 278.) "The Legislature has effected this change by operation of law, with no additional resentencing procedure required." (*Id*. at p. 278.) Because the parole eligibility cap of section 3051 supersedes the mandatory sentence imposed by the trial court, "[s]uch a sentence is neither LWOP nor its functional equivalent," and therefore, "no *Miller* claim arises." (*Franklin,* at p. 279.)

Here, as in *Franklin*, *supra*, 63 Cal.4th 261, Adam and Isaac do not come within any of section 3051's exclusions and their controlling offenses carried a prison term of 25 years to life, making them eligible for a youth offender parole hearing during their respective 25th years of incarceration. However, unlike *Franklin*, where the trial court imposed a mandatory sentence of 50 years to life, the trial court in this case was not required to impose an aggregate indeterminate prison term of 120 years to life plus a consecutive determinate term of 9 years 4 months. In *Franklin*, our Supreme Court limited its "mootness holding" to circumstances in which "section 3051 entitles an inmate to a youth offender parole hearing against the backdrop of an otherwise lengthy *mandatory* sentence" and expressed no view "on *Miller* claims by juvenile offenders . . . who are serving lengthy sentences imposed under *discretionary* rather than mandatory sentencing statutes." (*Id*. at p. 280, italics added.) Nevertheless, a sizeable portion of the sentences imposed in this case was mandatory. The trial court had no discretion but to impose a term of 20 years to life for the murder and a consecutive term of 25 years to life for the firearm enhancement attached to that count. (See §§ 190, subd. (d), 12022.53, subd. (d).) While the trial court did possess discretion to impose concurrent rather than consecutive sentences on the remaining attempted murder counts (see § 669; *People v. Shaw* (2004) 122 Cal.App.4th 453, 458 [trial court has "broad discretion to impose consecutive sentences when a person is convicted of two or more crimes"]), the lowest possible term these juvenile offenders were eligible for was 45 years to life. Moreover, as we have explained, the rationale behind the court's mootness holding in *Franklin* is that section 3051 "effectively reforms the parole eligibility date of a juvenile offender's original sentence so that the longest possible term of incarceration before parole eligibility is 25 years." (*Franklin*, *supra*, 63 Cal.4th at p. 281.) If that fact precludes a lengthy mandatory sentence from being considered the functional equivalent of LWOP, we perceive no reason the same would not be true with respect to the sentences imposed here, a portion of which was mandatory and the remainder discretionary.

Simply put, SB 260 has rendered moot the *Miller, supra,* 132 S.Ct. 2455 claim brought by Adam and Isaac by superseding their original sentences, effectively reforming the parole eligibility date so that they will be eligible for parole during their respective 25th years of incarceration.

Ordinarily, the conclusion that a claim is moot ends the inquiry. However, in *Franklin*, the court remanded the matter to the trial court for the limited purpose of determining whether or not the juvenile offender in

that case "was afforded sufficient opportunity to make a record of information relevant to his eventual youth offender parole hearing." (*Franklin, supra,* 63 Cal.4th at p. 284.) This was done because the youth offender parole hearing established by SB 260 "shall provide for a meaningful opportunity to obtain release" (§ 3051, subd. (e)), which requires the Board of Parole Hearings to "give great weight to the diminished culpability of juveniles as compared to adults, the hallmark features of youth, and any subsequent growth and increased maturity" (§ 4801, subd. (c)), the statutory scheme also "contemplate[s] that information regarding the juvenile offender's characteristics and circumstances at the time of the offense will be available at a youth offender parole hearing to facilitate the Board's consideration" (*Franklin,* at pp. 283-284, citing § 3051, subd. (f)), and it was "not clear" whether the juvenile offender in *Franklin* "had sufficient opportunity to put on the record the kinds of information that sections 3051 and 4801 deem relevant at a youth offender parole hearing." (*Franklin,* at p. 284.) Indeed, because the juvenile offender in *Franklin* was sentenced before *Miller, supra,* 132 S.Ct. 2455 was decided, and because the term imposed was a mandatory sentence, the trial court understandably deemed such mitigating evidence irrelevant. (*Franklin,* at p. 283.)

In contrast, here, Adam and Isaac were sentenced after the *Miller* decision (*Miller, supra,* 132 S.Ct. 2455) and the record establishes they were afforded sufficient opportunity to make a record regarding their characteristics and circumstances at the time they opened fire on Ellison's car. Specifically, in their respective sentencing memoranda, Adam and Isaac each argued the sentence recommended by the probation department violated the Eighth Amendment and urged the trial court to impose a term of 20 years to life based on *Miller*, *Graham*, *supra,* 560 U.S. 48, and *Caballero, supra,* 55 Cal.4th 262. Adam's submission included 23 character reference letters attesting to his good character despite his active participation in the murder. The content of these letters relates directly to the question of whether Adam is one of those rare juvenile offenders who may be deemed to be "irreparably corrupt, beyond redemption, and thus unfit ever to reenter society . . . ." (*People v. Gutierrez* (2014) 58 Cal.4th 1354, 1391.)

* * *

As contemplated by the statutory scheme enacted by SB 260, the foregoing information regarding Adam and Isaac's characteristics and circumstances at the time of the offense will be available at a youth offender parole hearing to facilitate the Board's consideration as to whether or not to grant them release. (*Franklin*, *supra*, at pp. 283-284; § 3051, subd. (f).) We therefore need not remand the matter to the trial court for a determination as to whether these juvenile offenders had an opportunity to produce such evidence.

ECF No. 14-1, pgs. 31-40.

///

///

///

30

2.  Petitioner's Claim

Petitioner argues in his federal petition the state court's determination is contrary to clearly established law.  See ECF No. 1, pg. 53.  According to Petitioner:

> Adam was 17 years old at the time of the charged crimes of which he was convicted. He was sentenced to an indeterminate term of 120 years to life plus a determinate sentence of nine years, and four months. (1 CT 11, 129-132.) The Court of Appeal reversed all the gang offenses and enhancements under compulsion of *People v. Prunty* (2015) 62 Cal.4th 59. Even with the reversal of the gang enhancements, Adam's sentence constitutes cruel and unusual punishment under the Eighth Amendment to the United States Constitution, as construed in: *Graham v. Florida,* 560 U.S. 48, 75 (2010) (holding that, under the Eighth Amendment, juvenile offenders convicted of nonhomicide crimes may not be sentenced to life in prison without parole and that such offenders must be given "some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation"); *Miller v. Alabama,* 567 U.S. 460,476,483 (2012) (holding that, under the Eighth Amendment, juvenile homicide offenders may not receive "mandatory life-without-parole sentences" and that, before sentencing such offenders to life without parole, the sentencing court must consider their "youth and attendant characteristics" (emphasis added)).
>     The Court of Appeal misapplied the decision in *People v. Franklin* (2016) 63 Cal.4th 261, and found "SB 260 has rendered moot the Miller, supra, 132 S.Ct. 2455 claim brought by Adam and Isaac by superseding their original sentences, effectively reforming the parole eligibility date so they will be eligible for parole during their respective 25 years of incarceration." (Exh. A at 38) However, Adam contends the *Franklin* holding that Penal Code section 3051 renders Adam's claim moot does not apply in this case. *Franklin* stated as follows:
>
>> Our mootness holding is limited to circumstances where, as here, section 3051 entitles an inmate to a youth offender parole hearing against the backdrop of an otherwise lengthy mandatory sentence. We express no view on Miller claims by juvenile offenders who are ineligible for such a hearing under section 3051, subdivision (h), or who are serving lengthy sentences imposed under discretionary rather than mandatory sentencing statutes." *(People v. Franklin,* supra, 63 Cal.4th 261, 280.)
>
>     *Franklin* specifically excepted cases such as Adam's from its mootness holding. The majority of Adam's lengthy sentence was the result of discretionary rather than mandatory sentence choices. Adam was sentenced to an aggregate term of 129 years, and four months to life. (1 CT 11, 129-132.) Thus, the mootness holding of Franklin does not apply.
>     The sentence petitioner challenges here did not comply with *Miller's* requirement that its exercise of discretion in sentencing a juvenile offender must take into account how children are different and how those differences counsel against irrevocably sentencing them to a lifetime in prison. Penal Code section 3051 does nothing to provide any new discretion to a sentencing court and gives a sentencing court no ability to treat children any differently when sentencing them. All the statute does is

31

provide for a "Youthful Offender Parole Hearing" deep in the future. That hearing would once again involve no judicial discretion. That hearing, as governed by the Penal Code section 3051, cannot come any sooner than the 25th year of petitioner's incarceration, assuming the statute does not get repealed. The statutes does nothing to alter the fact that petitioner's sentence remains an aggregate term of "129 years and 4 months to life."

Contrary to the Court of Appeal's conclusion that SB 260 renders the *Miller* claims moot, the new law does not comply with the central concern of the *Miller* court, which now requires a sentencing court "to take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison." *(Miller, supra,* 567 U.S. at p. [132 S.Ct. at p. 2469].)

Because there is no guarantee that the new statute will not get repealed, and because all defendants have the right to sentence that does not violate the prohibition against cruel and unusual punishment that is imposed by a judge, Adam is entitled to judicial remedy of the Eighth Amendment violation at this time. Adam is entitled to a new sentencing hearing where he is afforded an opportunity for parole which is part of his judicially imposed sentence and which cannot be removed or altered by changes in legislation. In sum, Adam's sentence which is the functional equivalent of LWOP, violates the Eighth Amendment and is contrary to established Supreme Court precedent.

ECF No. 1, pgs. 53-55.

3.      Respondent's Answer

Respondent contends any challenge to Petitioner's original sentence is moot, and any challenge to his current sentence is unexhausted.  See ECF No. 19., pgs. 24-26.  According to Respondent:

Federal courts are barred from hearing matters, including habeas petitions, in the absence of a live case or controversy. *See, e.g., Spencer v. Kemna,* 523 U.S. 1, 8 (1998); *Deakins v. Monaghan,* 484 U.S. 193, 199 (1988). Specifically, a federal habeas claim is moot when it cannot be redressed by the issuance of a writ of habeas corpus because either (1) the petitioner has received the relief requested in the petition; or (2) the court is unable to provide the petitioner with the relief sought. *Spencer v. Kemna,* 523 U.S. at 8; *Burnett v. Lampert,* 432 F.3d 996, 1000-01 (9th Cir. 2005); *Munoz v. Rowland,* 104 F.3d 1096, 1097-98 (9th Cir. 1997).

Here, Petitioner claims that because the state law granting him a juvenile parole hearing "does nothing to alter the fact that [his] sentence remains an aggregate term of '129 years and 4 months to life,'" he is "entitled to a new sentencing hearing where he is afforded an opportunity for parole which is part of his judicially imposed sentence and which cannot be removed or altered by changes in legislation." (Doc. 1 at 49.) But Petitioner's sentence does not remain 129 years 4 months to life. He has already received both a new hearing and a new sentence. (Lod. Doc. 4.) Now, he will be eligible for parole after serving less than 30 years, regardless of any potential legislative changes to the juvenile parole hearing. Because the sentence that Petitioner collaterally attacks has been reduced by 100 years, this Court is unable to provide his requested relief,

1        rendering his claim moot.

2                                    * * *

3                To the extent that Petitioner's claim can be interpreted as a
        constitutional challenge to his current 29 years 4 months to life sentence,
4        his claim is unexhausted. State prisoners seeking a writ of habeas corpus
        from a federal court must first exhaust their remedies in state court. 28
5        U.S.C. § 2254(b)(1)(A); *Baldwin v. Reese*, 541 U.S. 27, 29 (2004). A
        petitioner has exhausted his federal claims when he has fully and fairly
6        presented them to the state courts. *O'Sullivan v. Boerckel*, 526 U.S. 838,
        844-45 (1999); *Ybarra v. McDaniel*, 656 F.3d 984, 991 (9th Cir. 2011).
7        The state courts must have been presented with the specific federal
        constitutional guarantee at issue and a statement of the operative facts that
8        support the federal legal theory. *Gentry v. Sinclair*, 705 F.3d 884, 897, 901
        (9th Cir. 2013). Federal habeas corpus relief cannot be granted unless a
9        petitioner has exhausted his state court remedies. *Ybarra*, 656 F.3d at 991;
        *see Rhines v. Weber*, 544 U.S. 269, 274 (2005) (observing that AEDPA
10       preserved the total exhaustion requirement set forth in *Rose v. Lundy*, 455
        U.S. 509, 510 (1982)).
11               There is no record that Petitioner has ever challenged his new
        sentence in any state court. Thus, any federal claim challenge to the
12       current sentence is unexhausted and may only be denied.

13       ECF No. 19, pgs. 24-26.

14       4.      <u>Analysis</u>

15       Respondent's arguments – to which Petitioner did not reply – are persuasive.  The

16 record establishes that Petitioner's current sentence is 29 years plus four months to life.  <u>See</u> ECF

17 No. 14-4, pgs. 1-5 (Abstract of Judgement on resentencing).  Procedurally, there is no relief this

18 Court can grant with respect to the original sentence, which has been superseded.  It is also

19 obvious from the record that Petitioner's Eighth Amendment claim is unexhausted as to his

20 current sentence.  Because the California Supreme Court denied direct review on December 14,

21 2016, claims related to the modified sentence issued on January 26, 2017, could not have been

22 fairly presented.

23       Even so, Petitioner's Eighth Amendment claim fails on the merits when applied to

24 his current sentence.  Petitioner contends his original sentence of 120 years to life plus 9 years 4

25 months – for a crime committed when he was 17 years old – amounts to an unconstitutional

26 sentence of life without the possibility of parole.  The factual premise of this argument, however,

27 no longer exists because Petitioner's sentence has been reduced by 100 years.  There is simply no

28 clearly established Supreme Court precedent upon which a court could conclude that Petitioner's

current sentence of effectively 29 years to life with the hope of reprieve while he is still is a relatively young man is disproportionate to convictions on one count of second-degree murder and four counts of attempted murder.[3]

## IV.  CONCLUSION

Based on the foregoing, the undersigned recommends that Petitioner's petition for a writ of habeas corpus, ECF No. 1, be denied.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within 14 days after being served with these findings and recommendations, any party may file written objections with the court.  Responses to objections shall be filed within 14 days after service of objections. Failure to file objections within the specified time may waive the right to appeal.  See Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

Dated:  February 17, 2021

DENNIS M. COTA
UNITED STATES MAGISTRATE JUDGE

---

[3]     Likewise, the Court is perplexed that an Eighth Amendment claim was raised in the federal petition given the state court procedural history of which Petitioner's counsel was surely aware.

34